12-4881-cv
Liberty Mut. Ins. Co. v. Donegan

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2013

(Argued: November 18, 2013     Decided: February 4, 2014)

Docket No. 12-4881-cv

- - - - - - - - - - - - - - - - - -x

LIBERTY MUTUAL INSURANCE COMPANY,

Plaintiff-Appellant,

- v.-

SUSAN L. DONEGAN, IN HER CAPACITY AS THE COMMISSIONER OF THE VERMONT DEPARTMENT OF FINANCIAL REGULATION,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - -x

Before:          KEARSE, JACOBS, and STRAUB, Circuit Judges.

Liberty Mutual Insurance Co. appeals from a judgment entered in the

United States District Court for the District of Vermont (Sessions, J.).  The district

court concluded that the Employee Retirement Income Security Act of 1974 does

not preempt a Vermont statute and regulation requiring self-insured employee health plans to report to the state, in specified format, claims data and "other information relating to health care." For the following reasons, we reverse and remand with instructions to enter judgment for Liberty Mutual.

Judge STRAUB dissents in part and concurs in part in a separate opinion.

NANCY G. ROSS, McDermott Will & Emery LLP, Chicago, IL (John A. Litwinski, McDermott Will & Emery LLP, Chicago, IL; M. Miller Baker, McDermott Will & Emery LLP, Washington, DC, on the brief), for Appellant.

BRIDGET C. ASAY, Assistant Attorney General, Office of the Attorney General, Montpelier, VT for William H. Sorrell, Attorney General, State of Vermont, for Appellee.

KATHRYN COMERFORD TODD, National Chamber Litigation Center, Washington, DC (Jane E. Holman, National Chamber Litigation Center, Washington, DC; Carol Connor Cohen and Nancy S. Heermans, Arent Fox LLP, Washington, DC, on the brief), for amicus curiae Chamber of Commerce of the United States of America in support of Appellant.

MELISSA MOORE, U.S. Department of Labor, Washington, DC (M. Patricia Smith,

Solicitor of Labor; Timothy D. Hauser, Associate Solicitor; Nathaniel I. Spiller, Counsel for Appellate and Special Litigation, on the brief), for amicus curiae Acting Secretary of the United States Department of Labor in support of Appellee.

DENNIS JACOBS, Circuit Judge:

Liberty Mutual Insurance Co. operates a self-insured employee health plan. A Vermont statute requires all "health insurers" (including self-insured plans) to file with the State reports containing claims data and other "information relating to health care." A State regulation specifies how such information must be recorded and transmitted.

When Vermont subpoenaed claims data from the Liberty Mutual plan's third-party administrator, this suit was commenced in the United States District Court for the District of Vermont (Sessions, J.). Liberty Mutual sought a declaration that the Employee Retirement Income Security Act of 1974 ("ERISA") preempts the Vermont statute and regulation. The district court granted summary judgment in favor of Vermont.

The ERISA preemption clause is not self-reading and ERISA preemption doctrine is not static. The early judicial consensus, based on the broad wording

3

of the preemption clause (and legislative history), was to construe preemption broadly. More recent precedent has pulled back by setting a rebuttable presumption against preemption of state health care regulations. Two constants, however, remain: (1) recognition that ERISA's preemption clause is intended to avoid a multiplicity of burdensome state requirements for ERISA plan administration; and (2) acknowledgment that "reporting" is a core ERISA administrative function. These two considerations lead us to conclude that the Vermont law, as applied to compel the reporting of Liberty Mutual plan data, is preempted. We therefore reverse and remand for entry of judgment in favor of Liberty Mutual.

**BACKGROUND**

**I**

The Vermont statute establishes and provides for the maintenance of "a unified health care database." Vt. Stat. Ann. tit. 18, § 9410(a)(1). The database "enable[s]" the State's Department of Banking, Insurance, Securities and Health

Care Administration ("Department")[1] "to carry out [its] duties . . . , including":

> (A) determining the capacity and distribution of existing resources;
> (B) identifying health care needs and informing health care policy;
> (C) evaluating the effectiveness of intervention programs on improving patient outcomes;
> (D) comparing costs between various treatment settings and approaches;
> (E) providing information to consumers and purchasers of health care; and
> (F) improving the quality and affordability of patient health care and health care coverage.

Id.

To populate the database, the statute requires "[h]ealth insurers, health care providers, health care facilities, and governmental agencies" to "file reports, data, schedules, statistics, or other information," as the Department deems necessary, at the time and place and in the manner the Department requires. Id. at § 9410(c)-(d). The statute authorizes the Department to require the filing of "health insurance claims and enrollment information used by health insurers" and "any other information relating to health care costs, prices, quality, utilization, or resources." Id. at § 9410(c).

---

[1] The Department is now called the Department of Financial Regulation. Many of the Department's health care database responsibilities were recently transferred to Vermont's Green Mountain Care Board. See id. § 9410.

Knowing and willful failure to comply is punishable by penalty of not more than $10,000 per violation. See id. at § 9410(g).

In 2008, the Department promulgated a regulation to implement the statute and create the Vermont Healthcare Claims Uniform Reporting and Evaluation System (the "Reporting System"). See Regulation H-2008-01, 21-040-021 Vt. Code R. § 1 ("Regulation H-2008-01"). The regulation requires reporting of myriad categories of claims data. See infra 26-29. "Health Insurers" are required to "regularly submit medical claims data, pharmacy claims data, member eligibility data, provider data, and other information relating to health care provided to Vermont residents and health care provided by Vermont health care providers and facilities to both Vermont residents and non-residents in specified electronic format to the Department for each health line of business . . . per the data submission requirements contained in" appendices to the regulation. Regulation H-2008-01 § 4(D).

A "[h]ealth insurer" is defined broadly to include "any health insurance company, . . . third party administrator, . . . and any entity conducting administrative services for business or possessing claims data, eligibility data, provider files, and other information relating to health care provided to Vermont

6

residents or by Vermont health care providers and facilities." Id. § 3(X).

Begging the preemption question, the term "[h]ealth insurer" "may also include, *to the extent permitted under federal law*, any administrator of an insured, self-insured, or publicly funded health care benefit plan offered by public and private entities." Id. (emphasis added). A health insurer with 200 or more enrolled or covered members in each month during a calendar year is designated a "Mandated Reporter." Id. § 3(Ab). All other entities are "Voluntary Reporter[s]." Id. § 3(As).

The Department makes the collected data "available as a resource for insurers, employers, providers, purchasers of health care, and state agencies to continuously review health care utilization, expenditures, and performance in Vermont." Vt. Stat. Ann. tit. 18, § 9410(h)(3)(B). The Department decides "the extent" of such disclosure "allowed by HIPAA," the federal Health Insurance Portability and Accountability Act of 1996, id., and maintains the "confidentiality code" by which filed information "is handled in an ethical manner," id. § 9410(f). "[D]irect personal identifiers," such as name, address, and Social Security number, may not be publicly disclosed. Id. § 9410(h)(3)(D).

Sixteen other states collect health care data for their own health care claims databases. J.A. 368-74 (State Health Reporting Laws Summary Table). Data submission requirements vary. Some states provide only for voluntary reporting. See id. Some expressly exclude self-insured employee plan data from their database reporting laws. See id. The majority, however, follow Vermont in requiring such plans to report claims data. See id.

## II

Liberty Mutual Insurance Co. is the administrator and named fiduciary of a health plan (the "Plan") that provides benefits to 137 individuals in Vermont and to over 80,000 individuals nationwide. The Plan is "self-insured" or "self-funded," i.e., health care claims are paid from Liberty Mutual's general assets.

Plan documents provide that the "Plan has been established for the exclusive benefit of Participants and except as otherwise provided . . . , all contributions under the Plan may be used only for such purpose." J.A. 39. The documents also represent that medical records, such as those related to risk factor screening, are kept "strictly confidential." J.A. 71-72. The Plan represents, however, that it "shall comply with all other state and federal law to the extent

8

not preempted by ERISA and to the extent such laws require compliance by the Plan." J.A. 41.

Like many self-insured employer health plans, the Plan uses a third-party administrator ("TPA"). Blue Cross Blue Shield of Massachusetts, Inc. ("Blue Cross"), as the Plan's TPA for Vermont participants, does claims-handling: processing, review, and payment. Under its contract with Liberty Mutual, any information transferred to Blue Cross must be used solely for the purpose of administering the Plan, and Blue Cross auditors must guard against unauthorized disclosure of health care information. See J.A. 57-58. Liberty Mutual itself is a Voluntary Reporter because it has fewer than 200 covered members in Vermont (and has presumably decided not to volunteer); but because Blue Cross qualifies as a Mandated Reporter and possesses the Plan's claims data, the reporting of its data is mandatory.

In August 2011, Vermont issued a subpoena demanding that Blue Cross supply the Plan's "[e]ligibility files," "[m]edical claims files," and "[p]harmacy claims files" and threatened that noncompliance might result in fines and a suspension of Blue Cross's authority to do business. J.A. 24-25. Liberty Mutual instructed Blue Cross not to comply and filed this suit, seeking (1) a declaration

9

that ERISA preempts the Vermont statute and regulation; and (2) an injunction blocking enforcement of the subpoena. Vermont agreed to stay enforcement of the subpoena pending judicial resolution of the ERISA preemption question.

In dueling motions, Vermont sought to dismiss the complaint for lack of standing and for failure to state a claim, and Liberty Mutual moved for summary judgment. With the consent of the parties, the district court treated the motions as cross-motions for summary judgment. See Liberty Mut. Ins. Co. v. Kimbell, No. 2:11-cv-204, 2012 WL 5471225, at *1 (D. Vt. Nov. 9, 2012).

The court concluded that Liberty Mutual had Article III standing but that ERISA did not preempt the Vermont statute and regulation and that Vermont was therefore entitled to summary judgment. See id.

**DISCUSSION**

**I**

We agree with the district court that Liberty Mutual has standing to challenge the subpoena issued to Blue Cross.[2] Liberty Mutual has demonstrated

---

[2] The parties have not briefed the standing issue on appeal, but Article III standing "is the threshold question in every federal case, determining the power

10

"the irreducible constitutional minimum of standing": (1) "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that the injury will likely be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (footnote, citations, and internal quotation marks omitted).

It is of no moment that the subpoena was issued to Blue Cross and not directly to Liberty Mutual. The TPA agreement provides that Liberty Mutual will hold Blue Cross harmless for any financial charges "arising from or in connection with" the Plan. J.A. 54-55. Liberty Mutual therefore faces a choice between (1) allowing Blue Cross to turn over the Plan's data in what Liberty Mutual considers a violation of its duties as Plan administrator and fiduciary; or (2) directing non-compliance, and indemnifying Blue Cross for the ensuing civil penalties. Either way, under Lujan, Liberty Mutual suffers a redressable injury-in-fact as a direct result of Vermont's threatened, imminent action.

---

of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498 (1975).

## II

We review <u>de novo</u> the grant of summary judgment on the preemption question. <u>See, e.g.</u>, <u>Wrobel v. Cnty. of Erie</u>, 692 F.3d 22, 27 (2d Cir. 2012). Summary judgment is appropriate if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e may reverse the grant of summary judgment and order judgment for the non-moving party if we find undisputed support in the record entitling the non-moving party to judgment as a matter of law." <u>New England Health Care Emps. Union v. Mount Sinai Hosp.</u>, 65 F.3d 1024, 1030 (2d Cir. 1995).

### A

ERISA's comprehensive regulatory scheme governs most employee benefit plans, including self-insured health plans. <u>See</u> 29 U.S.C. § 1003. ERISA requires plan administrators to file annually with the Department of Labor reports detailing financial and actuarial information. <u>See id.</u> §§ 1021-1024. The Department of Labor is authorized "to undertake research and surveys and in connection therewith to collect, compile, analyze and publish data, information, and statistics relating to employee benefit plans." <u>Id.</u> § 1143. ERISA

12

broadly preempts "any and all State laws insofar as they may now or hereafter *relate to any employee benefit plan.*" Id. § 1144(a) (emphasis added). With remarkable consistency, the legislative history reflects that this broad wording was purposeful: it was intended to eliminate the threat of a multiplicity of conflicting or inconsistent state laws,[3] and to achieve broad preemptive effect in the areas of record-keeping, reporting, and disclosure.[4]

---

[3] See 120 Cong. Rec. 29197 (1974) (Statement of Rep. Dent) ("I wish to make note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the field of employee benefit plans. With the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation."); id. at 29933 (Statement of Sen. Williams) (discussing "inten[t] to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans" and stating that "[t]his principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law").

[4] See S. Rep. No. 93-127, at 35 (1973), reprinted in 1974 U.S.S.C.A.N. 4838, 4871 ("Because of the interstate character of employee benefit plans, the Committee believes it essential to provide for a uniform source of law in the areas of vesting, funding, insurance and portability standards, for evaluating fiduciary conduct, and *for creating a single reporting and disclosure system in lieu of burdensome multiple reports.*" (emphasis added)); H.R. Rep. No. 93-533, at 17 (1973), reprinted in 1974 U.S.S.C.A.N. 4639, 4655 (virtually the same); see also 120 Cong. Rec. 29942 (1974) (Statement of Sen. Javits) ("In view of Federal preemption, State laws compelling disclosure from private welfare or pension plans . . . will be superseded.").

13

Vermont argues—and the district court agreed—that Congress could not have intended broad preemption of state reporting laws because the same Congress also passed the National Health Planning and Resources Development Act of 1974 ("NHPRDA"). The NHPRDA provided for the establishment of state health planning agencies and authorized these agencies to "assemble and analyze data concerning" health; health care delivery, resources, and use; and related environmental factors. See Pub. L. No. 93-641, 88 Stat. 2225, at § 1513(b) (1975). The Supreme Court consulted the NHPRDA to decide ERISA preemption in a case in which the NHPRDA expressly contemplated a state regulatory measure. See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 665-67 (1995). Here, however, the NHPRDA is not similarly indicative.[5] And if there were tension between NHPRDA and ERISA, it was relieved in 1986 when the NHPRDA was repealed.

---

[5] The NHPRDA's encouragement of state data collection is not necessarily inconsistent with ERISA's preemptive reach. A lot of data can be collected from health care providers, and from health care payers other than ERISA plans. Nothing in the NHPRDA compels the conclusion that, contrary to every indication in ERISA's text and history, Congress intended to allow a multiplicity of state record-keeping and reporting requirements for self-insured employee plans.

**B**

The Supreme Court, and this Court, initially applied ERISA preemption as broadly as the statutory phrase ("relate to any employee benefit plan") seemed to require.

As explained in Shaw v. Delta Air Lines, Inc., the "breadth of [ERISA's] pre-emptive reach is apparent from that section's language." 463 U.S. 85, 96 (1983); see id. at 98 ("Congress used the words 'relate to' . . . in their broad sense.").[6] Shaw formulated the modern ERISA preemption test: a state law is preempted if "it *[1] has a connection with* or *[2] reference to* [an ERISA] plan." Id. at 96-97 (emphases added). The Court treated as obvious that ERISA preempted "state laws dealing with the subject matters covered by ERISA--*reporting, disclosure*, fiduciary responsibility, and the like." Id. at 98 (emphases added). The open question was whether preemption went *beyond* these core areas, and the Court held it did. See id. at 96-97. The one note of caution in Shaw was consigned to a footnote:

---

[6] That interpretation was supported by ERISA's exemption for generally applicable state criminal statutes, an exemption that would be unnecessary if preemption "applied only to state laws dealing specifically with ERISA plans." Shaw, 463 U.S. at 98 (discussing 29 U.S.C. § 1144(b)(4)).

15

Some state actions may affect employee benefits plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law "relates to" the plan. Cf. Am. Tel. & Tel. Co. v. Merry, 592 F.2d 118, 121 (CA2 1979) (state garnishment of a spouse's pension income to enforce alimony and support orders is not pre-empted). The present litigation plainly does not present a border-line question, and we express no views about where it would be appropriate to draw the line.

Id. at 100 n.21.

For another decade, the Supreme Court and this Court followed Shaw and repeatedly emphasized the broad reach of ERISA preemption. See, e.g., FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990) ("The pre-emption clause is conspicuous for its breadth."); Gen. Elec. Co. v. N.Y. State Dep't of Labor, 891 F.2d 25, 29 (2d Cir. 1989) ("ERISA was intended to have a 'sweeping preemptive effect in the employee benefit plan field.' Congress intended ERISA to occupy and regulate the field of employee benefit plans." (citation omitted)). The threat of conflicting state and local regulation was consistently cited as a paramount reason for preemption: Preemption "was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990); see Fort Halifax Packing Co. v.

16

Coyne, 482 U.S. 1, 10 (1987) ("We have not hesitated to enforce ERISA's pre-emption provision where state law created the prospect that an employer's administrative scheme would be subject to conflicting requirements. . . . Such a situation would produce considerable inefficiencies, which the employer might choose to offset by lowering benefit levels."); Howard v. Gleason Corp., 901 F.2d 1154, 1157 (2d Cir. 1990) ("[T]he express pre-emption provisions of ERISA are deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern in order to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations." (citations and internal quotation marks omitted)).

These cases specifically re-emphasized that "reporting" and "disclosure" are core ERISA functions subject to a uniform federal standard. See Ingersoll-Rand, 498 U.S. at 137 ("[ERISA] sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility . . . ."); FMC Corp., 498 U.S. at 58 (listing "reporting" and "disclosure" as "subject matters covered by ERISA").

The Supreme Court has explained the importance of having uniform federal record-keeping and reporting requirements:

[The legislative history] reflect[s] recognition of the administrative realities of employee benefit plans. An employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and *keeping appropriate records in order to comply with applicable reporting requirements*. The *most efficient way to meet these responsibilities is to establish a uniform administrative scheme*, which provides a set of standard procedures to guide processing of claims and disbursement of benefits. Such a system is *difficult to achieve, however, if a benefit plan is subject to differing regulatory requirements in differing States. A plan would be required to keep certain records in some States but not in others*; to make certain benefits available in some States but not in others; to process claims in a certain way in some States but not in others; and to comply with certain fiduciary standards in some States but not in others.

Fort Halifax, 482 U.S. at 9 (emphases added).

Liberty Mutual places great weight on the Supreme Court's summary affirmance of one of these early preemption cases, Standard Oil Co. v. Agsalud, 633 F.2d 760, 763 (9th Cir. 1980). We need not rest our ruling on that case or on so perfunctory a disposition as summary affirmance.[7] At the same time, it is

---

[7] The district court in Agsalud held that a Hawaii law (1) requiring workers to be covered by a comprehensive prepaid health care plan and (2) imposing "certain reporting requirements which differ[ed] from those of ERISA," was preempted. 442 F. Supp. 695, 696, 706-07 (N.D. Cal. 1977). Though the ruling rested mainly on the state's comprehensive prepaid plan requirement, the court added that the ERISA preemption clause "was intended at the very least to preempt state laws regulating disclosure [and] reporting." Id. at 706 n.11. The Ninth Circuit agreed with the district court, 633 F.2d 760, 763 (9th Cir.

18

telling that when Congress amended ERISA in 1983 "to exempt from preemption certain provisions of the Hawaii Act," it "did not exempt from preemption those portions of the law dealing with reporting, disclosure, and fiduciary requirements." Fort Halifax, 482 U.S. at 13 n.7; see H.R. Rep. No. 97-984, at 18 (Dec. 21, 1982) (Conf. Rep.) ("The provision continues Federal preemption of State law with respect to matters governed by the reporting and disclosure and the fiduciary responsibility provisions of ERISA . . . .").

## C

The Supreme Court's 1995 decision in New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co. marked something of a pivot in ERISA preemption. See 514 U.S. 645 (1995). The Court began "with the starting presumption that Congress does not intend to supplant state law," especially if the "state action [occurs] in fields of traditional state regulation," like

_____

1980), and the Supreme Court summarily affirmed, Agsalud v. Standard Oil Co., 454 U.S. 801 (1981). However, "the precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions." Anderson v. Celebrezze, 460 U.S. 780, 784 n.5 (1983) (internal quotation marks omitted).

19

health care.[8] Id. at 654-55. To preempt, a "clear and manifest purpose" by Congress is required. Id. at 655. Following on this presumption, the Court pulled back on its broad, literal reading of "relate to": if the phrase "were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course." Id.

Applying the two-part Shaw test in light of these new principles, the Court concluded that a state statute requiring hospitals to collect a surcharge from patients covered by commercial insurers was not preempted. See id. at 656. The Court explained that state law is preempted if it "mandate[s] employee benefit structures or their administration" or "provid[es] alternative enforcement

---

[8] The dissent relies on this presumption. See Dissenting Op. at 4-5. We acknowledge that the presumption applies when the state law "operates in a field that has been traditionally occupied by the States," and that "the historic police powers of the State include the regulation of matters of health and safety." De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 814 (1997) (internal quotation marks omitted). However, state health data collection laws do not regulate the safe and effective provision of health care services, which is among the states' historic police powers. And collecting data can hardly be deemed "historic"--most such laws were enacted only within the last ten years. See J.A. 368-74. In any event, the Supreme Court has repeatedly found the presumption overcome if the state laws "upset[] the deliberate balance central to ERISA," even if those laws "implement policies and values lying within the traditional domain of the States." Boggs v. Boggs, 520 U.S. 833, 840, 854 (1997).

20

mechanisms." Id. at 658. The state surcharge law withstood preemption in Travelers because it had no more than an "indirect economic influence" on ERISA plans, it did "not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself," and it did not "preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one." Id. at 659-60.

The Court again recognized the central roles of reporting and disclosure: ERISA "controls the administration of benefit plans, as by imposing *reporting and disclosure mandates*." Id. at 651 (emphasis added) (citation omitted). "Congress's extension of pre-emption to all state laws relating to benefit plans was meant to sweep *more* broadly than state laws dealing with the subject matters covered by ERISA, *reporting*, *disclosure,* fiduciary responsibility, and the like." Id. at 661 (emphases added) (internal quotation marks and brackets omitted).

Applying Travelers, cases conclude that state laws having only an "indirect economic effect on ERISA plans" lack sufficient "connection with" or "reference to" an ERISA plan to "trigger ERISA preemption." New England Health Care Emps. Union v. Mount Sinai Hosp., 65 F.3d 1024, 1030-33 (2d Cir. 1995); see also De Buono v. NYSA-ILA Med. & Clinical Servs. Funds, 520 U.S.

21

806, 809 (1997) (state hospital tax not preempted); NYS Health Maint. Org. Conference v. Curiale, 64 F.3d 794, 801-03 (2d Cir. 1995) ("[O]nly link [state surcharge law] has with ERISA plans is its indirect effect on rate diversification among insurers."). Nevertheless, the Supreme Court teaches that Travelers and its progeny do not disturb the long-standing principle that "state statutes that mandate[] employee benefit structures *or their administration*" have a "connection with" ERISA plans and are therefore preempted. Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., 519 U.S. 316, 328 (1997) (emphasis added) (internal quotation marks omitted). Like Travelers itself, later cases reiterate that "ERISA is expressly concerned" with "reporting, disclosure, fiduciary responsibility, and the like." Id. at 330 (internal quotation marks omitted); see also Boggs v. Boggs, 520 U.S. 833, 841 (1997); Plumbing Indus. Bd. v. E.W. Howell Co., 126 F.3d 61, 66 (2d Cir. 1997).

The use of preemption to avoid proliferation of state administrative regimes also remains a vital feature of the law. "[D]iffering state regulations affecting an ERISA plan's system for *processing claims* and paying benefits impose precisely the burden that ERISA pre-emption was intended to avoid." Egelhoff v. Egelhoff, 532 U.S. 141, 150 (2001) (emphasis added) (internal quotation marks

omitted)); see Romney v. Lin, 94 F.3d 74, 80 (2d Cir. 1996) ("basic purpose" of ERISA preemption is to "avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans").

It is true that this Court's three most recent cases focus primarily on "the relationships among the core ERISA entities," and caution against preemption of generally applicable state laws. See Stevenson v. Bank of N.Y. Co., 609 F.3d 56, 61 (2d Cir. 2010); Hattem v. Schwarzenegger, 449 F.3d 423, 429-31 (2d Cir. 2006); Gerosa v. Savasta & Co., 329 F.3d 317, 324 (2d Cir. 2003). But these cases involve either a state income tax with only indirect economic effects (the kind of law Travelers expressly permits), see Hattem, 449 F.3d at 425, or state law causes of action that have "little to do with the conduct of the plan," Gerosa, 329 F.3d at 328; see also Stevenson, 609 F.3d at 61 (noting that state law suit did not implicate "actual administration" of the plan). They do not purport to save state laws that subject plans to "sets of inconsistent state obligations" or that "tend to control or supersede central ERISA functions." Gerosa, 329 F.3d at 324, 328.

When this Court has allowed a state reporting requirement to withstand preemption, as it has in two post-Travelers cases, the requirement:

23

(1) imposed no "particular form" of record-keeping and created burdens "so slight" as to "create[] no impediment to an employer's adoption of a uniform benefit administration scheme," Burgio & Campofelice, Inc. v. NYS Dep't of Labor, 107 F.3d 1000, 1009 (2d Cir. 1997) (internal quotation marks omitted); or

(2) "sought information readily obtainable from an employer" without specifying "a particular form of record-keeping," HMI Mech. Sys., Inc. v. McGowan, 266 F.3d 142, 150-51 (2d Cir. 2001).

In effect, these cases adhere to the intact pre-Travelers principle against preemption of laws "creat[ing] no impediment to an employer's adoption of a uniform benefit administration scheme," Fort Halifax, 482 U.S. at 14, and with "too tenuous, remote, or peripheral" an effect on employee benefit plans, Shaw, 463 U.S. at 100 n.21. Thus HMI (which Vermont relies on heavily) cautioned that state subpoenas would indeed be "overbroad to the extent that they seek the amount of benefits that employees receive" or "examin[e] employer contributions on a benefit by benefit basis." HMI, 266 F.3d at 151.

**D**

We hold that the reporting requirements of the Vermont statute and regulation have a "connection with" ERISA plans (though no "reference to" them[9]) and are therefore preempted as applied. Our holding is supported by the principle (undisturbed in <u>Travelers</u>) that "reporting" is a core ERISA function shielded from potentially inconsistent and burdensome state regulation.[10]

ERISA preempts "state laws dealing with the subject matters covered by ERISA--*reporting*, *disclosure*, fiduciary responsibility, and the like." <u>Shaw</u>, 436 U.S. at 98 (emphases added). "[R]eporting" is necessarily a function distinct from the disclosure that administrators provide beneficiaries; otherwise

---

[9] The Vermont statute and regulation lack "reference to" an ERISA plan because they apply to all health care payers and do not act "exclusively upon ERISA plans." <u>Dillingham</u>, 519 U.S. at 325; <u>Travelers</u>, 514 U.S. at 656. A "connection with" an ERISA plan is sufficient, however, for preemption. <u>Shaw</u>, 463 U.S. at 96-97 (setting out disjunctive test).

[10] It is of no moment that the law is being applied to, and the subpoena targeted at, Liberty Mutual's TPA rather than Liberty Mutual itself. <u>See</u> <u>Pharm. Care Mgmt. Ass'n v. Dist. of Columbia</u>, 613 F.3d 179, 182 (D.C. Cir. 2010) (holding ERISA preempts state law provisions "insofar as they apply to a pharmaceutical benefits manager . . . under contract with an employee benefit plan (EBP) because they 'relate to' an EBP"). We agree with the D.C. Circuit that "the objective of uniformity in plan administration" is not "for some reason inapplicable simply because a plan has contracted with a third party to provide administrative services." <u>Id.</u> at 185.

25

"reporting" would be subsumed by "disclosure" and rendered superfluous. Rather, "reporting" entails what Vermont requires be done: plan record-keeping, and filing with a third-party.

But whatever the scope of plan "reporting," Vermont cannot deny that that is what it is seeking. The relevant database is called the "Vermont Healthcare Claims Uniform *Reporting* and Evaluation System" and the operative section of the regulation is titled "*Reporting Requirements*."[11] Regulation H-2008-01 §§ 3(Ar), 4 (emphases added).

Not every state law imposing a reporting requirement is preempted. Burgio and HMI allow a slight reporting burden to be laid on plans, consistent with the preemption rule tolerating laws that "create[] no impediment to an employer's adoption of a uniform benefit administration scheme," Fort Halifax, 482 U.S. at 14, and with "too tenuous, remote, or peripheral" an effect on employee benefit plans, Shaw, 463 U.S. at 100 n.21.

_____

[11] The dissent argues that the "reporting requirement imposed by the Vermont statute differs in kind from the 'reporting' that is required by ERISA and therefore was not the kind of state law Congress intended to preempt." Dissenting Op. at 1. But the conclusion does not follow from the premise. To the contrary: A hodge-podge of state reporting laws, each *more* onerous than ERISA's uniform federal reporting regime, and seeking different and additional data, is exactly the threat that motivates ERISA preemption.

26

But the reporting mandated by the Vermont statute and regulation is burdensome, time-consuming, and risky. Even considered alone, the Vermont scheme triggers preemption; considered as one of several or a score of uncoordinated state reporting regimes, it is obviously intolerable.

A quick overview of the Reporting System is telling:

- Plans must periodically report:

  (1) "medical claims data" "composed of service level remittance information for all non-denied adjudicated claims for each billed service including, but not limited to member demographics, provider information, charge/payment information, and clinical diagnosis and procedure codes, and . . . includ[ing] all claims related to behavioral or mental health";

  (2) "pharmacy claims data" "containing service level remittance information from all non-denied adjudicated claims for each prescription including, but not limited to: member demographics[,] provider information[,] charge/payment information[,] and national drug codes";

(3) "member eligibility data" "containing demographic information for each individual member eligible for medical or pharmacy benefits for one or more days of coverage at any time during the reporting month";

(4) and any "other information relating to health care provided to Vermont residents and health care provided by Vermont health care providers and facilities to both Vermont residents and non-residents . . . for each health line of business." Regulation H-2008-01 §§ 3-4.

- Plans must report their data frequently. Thus plans with 500 to 1,999 covered members must report *quarterly* and plans with 2,000 or more covered members must report *monthly*. See id. § 6(I). Compare this to ERISA, which requires a single report *annually*. See 29 U.S.C. § 1021.

- Data must be coded under the appropriate source code system. See Regulation H-2008-01 § 5(A)(5)(a). Sixteen source code systems are provided, including the "Admission Source Code" ("[a] variety of codes explaining who recommended admission to a medical facility") and the "International Classification of Diseases, 9th

28

Revision, Clinical Modification" code ("describes the classification of morbidity and mortality information for statistical purposes and for the indexing of hospital records by disease and operations"). Id. Appendix A.

- "Individual data elements, data types, field lengths, field description/code assignments, and mapping locators" for each file must conform to specified requirements. Id. § 5(B). Fields include "Admission Hour" and "Discharge Hour," thirteen "Diagnosis" fields, three "Procedure" fields, and the "Drug Name" and "Quantity Dispensed". Id. Appendices C-1-E-2.

- "[T]he social security number of the member/subscriber and the subscriber and member names" must be encrypted prior to submission by "utilizing a standard encryption methodology provided." Id. § 5(A)(5)(b). (Encryption is not required for other data fields.)

And nothing prevents the Department from changing these myriad requirements from time to time, so long as the Department complies with the broad mandate of the statute.

29

The confidentiality provisions of the Vermont scheme are complex but loose, and impair or (at least) reassign the obligation in the Plan documents to keep medical records strictly confidential, as well as the undertaking by Blue Cross as TPA to use information solely for Plan administration purposes and to prevent unauthorized disclosure.[12] The regulation specifically contemplates "access to health care claims data sets and related information" by "persons other than the Department." Id. § 8. Each data field is classified into one of three "use and release" categories:

(1) "Unavailable Data Elements": not available for general use and release.

(2) "Restricted Data Elements": only available for use and release as part of a "Limited Use Research Health Care Claims Data Set" approved by the Department. These elements, and information that can be derived from these elements, include the member's city and zip code, the

---

[12] Whether disclosure to Vermont is authorized under the Plan documents may turn on whether Vermont law creates authorization, because the Plan undertakes to comply with state law; but compliance is allowed only "to the extent not preempted by ERISA," a limitation that leaves the Plan and the TPA in a complex and expensive legal muddle.

admission and discharge dates and hours, and the service provider and pharmacy names.

(3) "Unrestricted Data Elements": "available for general use and public release . . . . upon written request." These publicly available elements, and information that can be derived from these elements, include the member's gender, age, medical coverage, prescription drug coverage, and diagnosis; the type of procedure; the service provider's speciality and zip code; and the name and price of any drugs prescribed. Id. § 8 & Appendices J-1-J-14. Specific as these categories are, they may be illusory, because the Department can ease public release restrictions on data that is currently restricted or unavailable, so long as "direct" personal identifiers are not published and the data is (in the Department's opinion) handled in an "ethical manner." Vt. Stat. Ann. tit. 18, § 9410(e)-(f), (h)(3)(D).

Since other states can impose their own regimes for reporting—and many do—these burdens and risks must be multiplied.

The trend toward narrowing ERISA preemption does not allow one of ERISA's core functions—reporting—to be laden with burdens, subjected to

31

incompatible, multiple and variable demands, and freighted with risk of fines, breach of duty, and legal expense.[13]

**CONCLUSION**

For the foregoing reasons, we reverse and remand with instructions to enter judgment for Liberty Mutual.

---

[13] The dissent draws a "distinction between general administration and administration of plans, claims, and benefits" and concludes that ERISA preemption doctrine does not reach state reporting laws that implicate the former. Dissenting Op. at 14. Essentially, the dissent would preempt state reporting laws only if they require plans to submit financial statements. The dissent's view of ERISA plan "administration" and "reporting" is unduly narrow.

The overview of requirements (set out above) makes clear that Vermont requires ERISA plans to record, in specified format, massive amounts of claims information and to report that information to third parties, creating significant (and obvious) privacy risks and financial burdens that will be passed from the TPA to the Plan and from the Plan to the beneficiaries. That is not a proper allocation of plan assets. See 29 U.S.C. § 1104(a)(1)(A) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan[.]"). Modest financial burdens may be tolerable when the state laws imposing them do not directly implicate an ERISA core administrative concern. But the statute and regulation here require reporting of health claims, pharmacy claims, etc., information about the essential functioning of employee health plans.

STRAUB, *Circuit Judge*, dissenting in part and concurring in part:

I respectfully dissent in part and concur in part.

I concur with part I of the discussion section of the majority opinion finding that Liberty Mutual has standing. For the reasons that follow, I dissent from the majority's holding that the Vermont statute is preempted by ERISA.

The majority finds that the burden imposed by the Vermont reporting requirement warrants preemption of the statute. This conclusion falters for two primary reasons. First, the reporting requirement imposed by the Vermont statute differs in kind from the "reporting" that is required by ERISA and therefore was not the kind of state law Congress intended to preempt. Second, Liberty Mutual has failed to show any actual burden, much less a burden that triggers ERISA preemption. Rather, the Vermont statute, like others we have previously upheld, does not interfere with an ERISA plan's administration of benefits. For these reasons, our precedent and that of the Supreme Court do not support the conclusion that the Vermont statute's reporting requirements pose the sort of threat to "the nationally uniform administration of employee benefit plans" that would trigger preemption. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657 (1995) (hereinafter "*Travelers*").

-1-

Looking at the objectives of ERISA and the impact of the Vermont statute on ERISA plans, as we must in order to determine whether the statute has an improper "connection with" ERISA plans, I conclude that this is not the type of statute that Congress intended to preempt.

**ANALYSIS**

The preemption clause of the ERISA statute provides that, with certain exceptions not relevant here, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has stated that the "basic thrust of the pre-emption clause . . . was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Travelers*, 514 U.S. at 657. "Pre-emption does not occur, however, if the state law has only a 'tenuous, remote, or peripheral' connection with covered plans, as is the case with many laws of general applicability." *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1008 (2d Cir. 1997) (internal quotations marks omitted) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

"Two kinds of state laws relate to ERISA for purposes of preemption: those that mandate employee benefit structures or their administration, and those that

provide alternative enforcement mechanisms." *HMI Mech. Sys., Inc. v. McGowan*, 266 F.3d 142, 149 (2d Cir. 2001) (internal quotation marks and brackets omitted). The Vermont statute does neither. We have noted that courts are "reluctant to find that Congress intended to preempt state laws that do not affect the relationships among" "the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and the plan itself." *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003). The Vermont statute does not even arguably regulate these relationships. Moreover, the Vermont statute does not impose regulations on how plans are to be run or how benefits are to be administered.

Yet the majority takes up Liberty Mutual's invitation to give the term "reporting" its broadest meaning, and finds the statute is preempted because "reporting" is a "core ERISA function shielded from potentially inconsistent and burdensome state regulation." (Maj. Op. at 24-25) While it is certainly true that ERISA's core areas include "reporting, disclosure, [and] fiduciary responsibility," *Shaw*, 463 U.S. at 98, and that "state laws that would tend to control or supersede central ERISA functions . . . have typically been found to be preempted," *Gerosa*, 329 F.3d at 324, the majority's argument misses the nuance of what "reporting"

means in the context of ERISA, and ignores the case law's focus on whether the *administration of benefits to beneficiaries* is impacted, an issue on which there is no showing.

## A. Traditional State Regulation of Health Care and the Presumption Against Preemption

The majority's finding, hidden in a footnote, that the presumption against preemption does not apply here, flies in the face of clear Supreme Court precedent instructing us to begin with the "presumption that Congress does not intend to supplant state law." *Travelers*, 514 U.S. at 654-55. "[I]n cases like this one where federal law is said to bar state action in fields of traditional state regulation, we have worked on the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 655 (internal citations and quotation marks omitted). This is because "nothing in the language of [ERISA] or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern." *Id.* at 661.

The majority nonetheless holds that the presumption against preemption does not apply here because "state health data collection laws do not regulate the

safe and effective provision of health care services." (Maj. Op. at 19 n.8) This contradicts the very Supreme Court precedent the majority relies upon: *DeBuono v. NYSA-ILA Medical and Clinical Services Fund*, 520 U.S. 806 (1997). In that case, New York imposed a tax on patient services at various health care providers. 520 U.S. at 808. The Court applied the presumption, reasoning that although the New York law was "a revenue raising measure, rather than a regulation of hospitals, it clearly operates in a field that 'has been traditionally occupied by the States.'" *Id.* at 814. The Court further stated that the fact that the challenged law "targets only the health care industry . . . supports the application of the 'starting presumption' against pre-emption," because "the historic police powers of the State include the regulation of matters of health and safety." *Id.* at 814 & n.10. *DeBuono* is indistinguishable from the case at hand. Here, the Vermont statute "targets only the health care industry" and, even if it is not a regulation of health care entities, it certainly "operates in [the] field" of health and safety. Indeed, the stated purpose of the Vermont statute is to help improve health care quality. *See* Vt. Stat. Ann. tit. 18 § 9410(a)(1) (listing purposes, including "improving the quality and affordability of patient health care"). There should be no question, therefore, that the presumption applies here.

**B.    There is No Improper "Connection With" ERISA Plans**

When analyzing whether ERISA preempts a state law, we apply the two-pronged *Shaw* test, as narrowed by *Travelers'* presumption against preemption. Under that test, we analyze whether a state law has an impermissible "connection with" or "reference to" an ERISA plan. *See, e.g., Hattem v. Schwartzenegger*, 449 F.3d 423, 428 (2d Cir. 2006). Despite paying lip service to the *Shaw* test, the majority eschews a full analysis in favor of a talismanic recitation of the word "reporting."

I agree with the majority that because the Vermont statute requires data collection from entities other than ERISA plans, such as hospitals, health insurers, and pharmacy benefit managers, it "functions irrespective of the existence of an ERISA plan" and therefore does not make an improper "reference to" ERISA plans. *See Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 328 (1997) (internal quotation marks and ellipsis omitted). The "connection with" prong, on which the majority hangs its hat, instructs us to examine both "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive" and the "effect of the state law on ERISA plans." *See Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147

-6-

(2001) (internal quotation marks omitted); *see also HMI,* 266 F.3d at 148

("Analyzing a state law's 'connection' with ERISA plans requires the courts to

consider ERISA's objectives and the effect of the state law on ERISA plans.").

This analysis leads to the conclusion that the Vermont statute is not preempted.

> **1.** **Objectives of ERISA**

The objectives of the ERISA statute are not in dispute. Congress "enacted

ERISA in 1974 to respond to growing concerns about the risk of employers

defaulting on pension plans, which were increasingly widespread but little

regulated." *See* Mallory Jensen, *Is ERISA Preemption Superfluous In the New Age of

Health Care Reform?,* 2011 Colum. Bus. L. Rev. 464, 472 (2011) (internal footnotes

omitted); *see also* Brendan S. Maher and Peter K. Stris, *ERISA and Uncertainty,* 88

Wash. U. L. Rev. 433, 440 n.29 (2010) ("Few dispute that the statute was passed,

in part, as a response to several high-profile pension defaults that arose from

company failures that devastated the pensions of many workers.") (citing J. A.

Wooten, *The Most Glorious Story of Failure in the Business: The Studebaker-Packard

Corp. & the Origins of ERISA,* 49 Buff. L. Rev. 683, 683-84 (2001)). Indeed, the

statute itself declares that, in passing ERISA, Congress sought to

protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).[1]

These objectives are reflected in the ERISA reporting and disclosure requirements, which are concerned with the mismanagement of funds and failure to pay employee benefits, and seek information on plan assets or allocation. *See* 29 U.S.C. § 1023 (requiring publication of annual report to include a financial statement of assets and liabilities, changes in fund balance, disclosures about changes made in the plan, and financial commitments, including loans, leases, and transactions, and an actuarial statement). The plain language of the ERISA reporting requirements shows that they are limited to the furnishing of a

---

[1] The Supreme Court has also noted that Representative Dent, the House sponsor of the legislation, "represented that ERISA's fiduciary standards 'will prevent abuses of the special responsibilities borne by those dealing with plans,'" and that the "disclosure and reporting requirements 'will enable both participants and the Federal Government to monitor the plans *operations*." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987) (quoting 120 Cong. Rec. 29197 and 29935 (1974)). "Senator Williams, the Senate sponsor, stated that these fiduciary standards would safeguard employees from 'such abuses as self-dealing, imprudent investing, and misappropriation of plan funds.'" *Id.* (quoting 120 Cong. Rec. 29932).

summary plan description to plan participants and an annual report to the Secretary. *See* 29 U.S.C. §§ 1021-30. The former is essentially a plain-English summary of key plan terms, *id.* §§ 1021-22, while the latter is concerned with the financial soundness of the plan, *id.* § 1023. Thus, under ERISA, plans must report information that goes to the financial integrity of the plan.

It is important to recognize that, as Liberty Mutual conceded at oral argument (Tr. at 9), the "reporting" required by ERISA is wholly distinct from the reporting sought by Vermont. As the majority describes in some depth, the Vermont statute seeks information on medical claims data, the services that have been provided to beneficiaries, charges and payments for those services, and demographic information about those receiving the coverage. (Maj. Op. at 26-29) At bottom, the state seeks to collect the information it needs to fulfill its role of providing health care to its citizens. Vermont does not seek information on plan assets, and does not review the allocation or denial of benefits, *see* Reg. H-2008-01, 21-040-021 Vt. Code R. § 5A(8) ("Denied claims shall be excluded from all medical and pharmacy claims file submissions"), the topics on which ERISA requires reports. Indeed, the Secretary of Labor, who oversees the reporting requirements and is responsible for enforcing and administering Title I of ERISA,

-9-

has advised us that the focus and purpose of Vermont's data collection is different from the reporting requirements in ERISA. *See Amicus* Secretary of Labor Br. at 12.

This contrast between the objectives and reporting requirements of ERISA and those of the Vermont statute suggests that the Vermont statute is not of the type that Congress intended to preempt.

### 2. Effect of the Vermont Statute on ERISA Plans

We look next to the effect of the Vermont statute on ERISA plans. The Vermont statute asks for after-the-fact information which plan administrators, such as Blue Cross Blue Shield of Massachusetts ("BCBSMA"), already have in their possession. *See* Tr. at 7-8. Indeed, by all accounts BCBSMA is happy to provide the data Vermont has asked for, and it does so for other clients. Because Liberty Mutual possesses all the information Vermont seeks, the only alleged burden here is providing the data to Vermont in the requested format.

The majority finds that there is an obvious burden connected with the formats and requirements specified by Vermont, although it does not explain exactly how that burden manifests itself. Perhaps this is because Liberty Mutual has failed to provide any details or showing of the alleged burden, arguing only

that "all regulations have their costs." Appellant's Br. at 28. *See also* Br. for *Amicus* Chamber of Commerce at 9 (increased steps required by a TPA to fulfill requirements) and 10 (arguing generally that additional requirements will "cost additional money").

In as much as this burden is a financial one, as Liberty Mutual suggests, we have stated clearly, as has the Supreme Court, that indirect financial costs from a state law are not a concern unless they "preclude uniform administration practice or the provision of a uniform interstate benefit package." *Travelers*, 514 U.S. at 660. Indeed, our case law addressing statutes which impose added costs on ERISA plans states clearly that an indirect economic impact is sufficient to trigger preemption only if it "produce[s] such acute, albeit indirect, economic effects as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Travelers*, 514 U.S. at 668; *see also Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 147 (2d Cir. 1989) (noting that "indirect economic and administrative effects are not substantial enough . . . to persuade us that this is the type of law Congress intended to preempt" and upholding Connecticut escheat law requiring Aetna to pay all unclaimed benefits to the State after three years, even though this would cause, *inter alia*, an increase

in premiums to employers, lower benefits for employees, and lower profits for Aetna).[2]  On the record before us, there is no basis to find that the Vermont statute would cause Liberty Mutual to increase its costs more than a *de minimus* amount to cover the cost of sending information to the state, much less that it would cause a fiduciary to change a plan in any way.  *See DeBuono*, 520 U.S. at 815 (noting that many state laws of "general applicability" will "impose some burdens on the administration of ERISA plans, but nevertheless do not 'relate to' them within the meaning of" ERISA).

The majority also suggests the Vermont statute is inconsistent with ERISA because of its supposed inconsistencies with other state reporting regimes.  To reach this conclusion, the majority relies on language from *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), suggesting that ERISA preempts laws which create conflicting state record-keeping requirements.  (Maj. Op. at 17-18)  *Fort Halifax* involved a preemption challenge to a Maine statute requiring an employer to provide a one-time severance payment to employees under certain

---

[2] The majority claims that "modest financial burdens" are only "tolerable when the state laws imposing them do not directly implicate an ERISA core concern," (Maj. Op. at 31 n.13) without citing to any authority.  This statement is directly contradicted by *Borges*, where financial burdens were acceptable despite implicating one of the most central ERISA concerns: the payment of benefits.

-12-

circumstances. 482 U.S. at 3. The Supreme Court found that the statute regulated employee benefits but did not regulate or establish an employee benefit "plan," and thus was not preempted by ERISA. *Id.* at 6-8.

The dicta in *Fort Halifax* on which the majority relies does not bear the weight the majority places upon it. To the extent *Fort Halifax* suggests that a state law may not require an ERISA plan to keep records it would not otherwise keep, that concern is not implicated here. The Vermont statute does not require plan administrators to keep any new records, it merely seeks access to the records that are already kept. *Fort Halifax* does not say anything about when or how a state may demand access to existent records.

Moreover, the language in *Fort Halifax* describing the "administrative realities of employment benefit plans," does not relate to all administrative concerns, but rather to the repeatedly articulated concern that there be "nationally uniform administration *of employee benefit plans*." *Travelers*, 514 U.S. at 657 (emphasis added). *See Fort Halifax*, 482 U.S. at 9 (suggesting it is most efficient for plans to have "a uniform administrative scheme, which provides a set of standard procedures to guide *processing of claims and disbursement of benefits*." (emphasis added)).

-13-

The distinction between general administration and administration of plans, claims, and benefits is important. Many state laws may have an impact on the administration of an ERISA plan – for example, a work-place safety law, a prevailing wage law, or a law that requires companies to report employment data. Such laws may impose additional costs, or require additional administrative resources. But none of these laws impact *how benefits are administered to beneficiaries* and, therefore, they are not preempted by ERISA. *See, e.g., Dillingham,* 519 U.S. 319 (upholding California prevailing wage law); *HMI,* 266 F.3d at 144 (upholding New York prevailing wage law); *Burgio,* 107 F.3d at 1003 (same). The reason for our focus on whether a state statute affects the relationships among "the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries," *see Gerosa,* 329 F.3d at 324, is because the concern is about whether the *administration of benefits to beneficiaries* is affected. The majority ignores this distinction and treats all administrative burdens as weighing in favor of preemption.

The importance of separating any impact on the administration of benefits from general impact upon any administrative concern is clearly articulated in *Egelhoff v. Egelhoff ex rel. Breiner*, which involved a Washington state statute

-14-

providing that "the designation of a spouse as the beneficiary of a nonprobate asset is revoked automatically upon divorce." 532 U.S. at 143. There, the Supreme Court stated that while "all state laws create some potential for a lack of uniformity," the concern was specifically whether "differing state regulations affect[] an ERISA plan's 'system for processing claims and paying benefits.'" *Id.* at 150 (quoting *Fort Halifax*, 482 U.S. at 10). The Court noted that the Washington statute at issue "interfere[d] with nationally uniform plan administration," as administrators could not "make payments simply by identifying the beneficiary specified by the plan documents" but instead had to "familiarize themselves with state statutes so that they c[ould] determine whether the named beneficiary's status has been 'revoked' by operation of law." *Id.* at 148-49. In clear contrast to *Egelhoff*, there is no argument here that the Vermont statute affects Liberty Mutual's "system for processing claims and paying benefits." *Id.* at 150 (internal quotation marks omitted).

It follows from these precedents that in order to show that the Vermont statute has a legally relevant effect on ERISA plans, there must be evidence of a burden on the system for processing claims. No such evidence has been provided, and the majority points to none. The only possible conclusion on the

-15-

record before us is that, other than through potential incidental costs, the Vermont statute does not hinder the national administration of employment benefit plans in any way. No new records need be kept, no distinction in benefits between Vermont and any other state need be made. This ends the inquiry.[3]

## C.    Reporting Requirements Upheld in *HMI* and *Burgio*

Using this same analysis, we twice concluded that ERISA did not preempt the reporting requirements in New York's prevailing wage law. *See HMI,* 266 F.3d 142; *Burgio,* 107 F.3d 1000. In both cases, the New York statute at issue required contractors and subcontractors to produce records showing their compliance with the prevailing wage rate and supplements. *See Burgio,* 107 F.3d at 1009; *HMI,* 266 F.3d at 151; N.Y. Lab. Law § 220. In *HMI,* we noted that although there were indirect effects on ERISA plans, such as "eliminating incentives for them to pool supplement contributions," the state's inquiry did not

---

[3] Any support that the majority draws from *Standard Oil Co. v. Agsalud,* 633 F.2d 760, 763 (9th Cir. 1980), is misplaced. See Maj. Op. at 18-19. The Ninth Circuit opinion, which the Supreme Court summarily affirmed, does not even mention the reporting requirement in the Hawaii Prepaid Care Act. The Hawaii statute was found to be preempted because it directly and expressly regulated employers and the benefits they provided. The reporting requirement fell along with the rest of the statute *without* discussion. The fact that Congress did not amend ERISA to except reporting or disclosure requirements says nothing about whether a court asked to evaluate such requirements would find them to be preempted.

-16-

"mandat[e] a particular benefit structure for ERISA plans," "require employers or ERISA plans to provide specific benefits," or delve into the internal allocations of benefits within the plan. 266 F.3d at 150-51; *see also Burgio*, 107 F.3d at 1009 (finding no preemption where law did not "regulate . . . the terms and conditions of employee benefit plans", "prescribe[] . . . the type and amount of an employer's contribution to a plan", or the "nature and amount of the benefits provided"). Rather, we said that "information such as a list of plan participants, payroll lists, the amount of an employer's contributions and the names of people for whom the employer made contributions are appropriate areas of inquiry" for the state. *HMI*, 266 F.3d at 151. Both opinions make clear that a state may properly seek information from ERISA plans for its own purposes without triggering preemption so long as the request for information "creates no impediment to an employer's adoption of a uniform benefit administration scheme," *Burgio*, 107 F.3d at 1009. As discussed above, the Vermont statute creates no such impediment, and therefore survives under the same analysis.

The majority attempts to distinguish these cases based on the manner in which Vermont asks to be provided information. But the fact that a particular format is required, without more, is meaningless. The record contains no

evidence that the burden of providing data to Vermont (and other states which may ask for it) would keep plans from administering their benefits uniformly and therefore trigger ERISA preemption. Likewise, the majority's statement that the reporting requirement is "time-consuming and risky" (Maj. Op. at 26) – even if considered relevant under our precedent – is nothing more than pure speculation. There is no evidence to support such a finding.

## CONCLUSION

Returning, then, to the language that must guide our inquiry, our decision depends on the objectives of the ERISA statute and the effect of the state law on ERISA plans. Although Congress intended to establish the regulation of employee benefit plans as an exclusively federal concern, it did not intend for health care to become the exclusive purview of the Federal Government. Rather, it anticipated that the States would continue to be involved in providing health care services to their citizens.

Liberty Mutual fails to overcome the presumption against preemption. The Vermont statute regulates health care within that state, while imposing a purely clerical burden on ERISA plans. I acknowledge that because Vermont may not be the only state with this type of law, plans governed by ERISA may

need to provide their records in different formats.  But our case law does not support a finding that this warrants preemption.  Indeed, it says uniformly that an economic burden imposed by a statute of general applicability, which does not affect the benefits that beneficiaries receive or how they receive them, is permissible.

Because the Vermont statute does not have an impermissible "connection with" ERISA plans, I respectfully dissent.